UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXXON MOBIL CORPORATION, | No. 2:25-cv-03104-DJC-JDP |
| Plaintiff, | |
| v. | ORDER |
| LAUREN SANCHEZ, et al., | |
| Defendants. | |

This case concerns whether a 1996 federal law concerning the "State regulation of securities offerings" prohibits California from requiring entities doing business within its borders to disclose the climate-related financial risks they face on their websites.  The Court concludes that it does not.

The challenged California law, S.B. 261, solely requires a covered entity to disclose climate-related financial risks on its website or pay a fine.  S.B. 261 does not in any way condition the offering of securities to investors in the state on making the climate-related disclosures it requires.  Therefore, the Court finds S.B. 261 is not preempted by the National Securities Markets Improvement Act, and Defendants' Motion to Dismiss is granted.

////

////

1

**BACKGROUND**

In October 2023, California enacted S.B. 253 and S.B. 261.  As explained by the California Legislature, these bills respond to the "[f]ailure of economic actors to adequately plan for and adapt to climate-related risks to their businesses" and reflects the Legislature's finding that these risks "to the economy will result in significant harm to California, residents, and investors, in particular to financially vulnerable Californians who are employed by, live in communities reliant on, or have invested in or obtained financing from these institutions."  2023 Cal. Stat., ch. 383 § 1(c).  Given these identified risks, S.B. 261 seeks to provide market participants with more consistent, reliable information about the climate-related financial risks faced by the largest public and private entities doing business in California.  *Id.* at § 1(j).

S.B. 261 requires companies with annual revenues exceeding $500 million that do business in California, such as ExxonMobil, to disclose information related to their "climate-related financial risk."  (Compl. (ECF No. 1) ¶ 45; Cal. Health & Safety Code § 38533(a)(4).)  The statute defines "[c]limate-related financial risk" as a "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks."  Health & Safety Code § 38533(a)(2).  Specifically, S.B. 261 requires a covered entity to prepare and publish on its website a "climate-related financial risk report" that discloses two categories of information.  *Id.* at § 38533(b)(1)(A); *id.* at § 38533(b)(4)(C)(1).  First, this report must disclose the covered entity's "climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017) published by the Task Force on Climate-related Financial Disclosures, or any successor thereto, or pursuant to an equivalent reporting requirement."  Health & Safety Code § 38533(b)(1)(A)(i).  Second, the report must detail the entity's "measures adopted to reduce and adapt" to that identified risk.  *Id.* at § 38533(b)(1)(A)(ii).  Covered entities must publish these reports on their websites every other year to comply with the statute.  *Id.* at § 38533(b)(1)(A).

Failure to comply results in an administrative penalty not exceeding $50,000. *Id.* at § 38533(f)(2).

On October 24, 2025, ExxonMobil filed the operative Complaint, which raises an as-applied First Amendment challenge and an as-applied Supremacy Clause challenge to S.B. 261.[1]  (Compl. ¶¶ 71–82.)  In November 2025, the Ninth Circuit enjoined Defendants from enforcing S.B. 261 pending the appeal of a First Amendment challenge to both bills in a separate action.  *See* Order, *Chamber of Com. v. Randolph*, No. 25-5327 (9th Cir. Nov. 18, 2025).

Accordingly, the Motion to Dismiss before the Court solely challenges Plaintiff's as-applied preemption claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  This matter is fully briefed.  (Mot. (ECF No. 28); Opp'n (ECF No. 38); Reply (ECF No. 40); Sur-Reply (ECF No. 45).)  The Court heard argument on Defendants' Motion to Dismiss on January 22, 2026.  Dawn Sestito and Jonathan Schneller appeared for Plaintiff and Caitlan McLoon and Katherine Gaumond appeared for Defendants.  At the conclusion of the hearing, the motion was taken under submission.[3]  (*See* ECF No. 46.)

## LEGAL STANDARD

A party may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint lacks a

---

[1] The Complaint also raises an as-applied First Amendment challenge to S.B. 253, which directs the California Air Resources Board to develop and adopt regulations that will require "reporting entit[ies]" to disclose their greenhouse gas emissions.  Cal. Health & Safety Code § 38532(c)(1).  However, as Defendants do not seek dismissal of this claim in this motion, the Court does not address it.

[2] Presumably because the Ninth Circuit will address the facial First Amendment challenge to S.B. 261 in the other action, this motion does not seek dismissal of Plaintiff's First Amendment claims.

[3] Both parties' unopposed requests for judicial notice are granted.  (ECF Nos. 28-1, 39.)  The Court takes judicial notice (ECF No. 28-1) of an SEC report as this report was "made publicly available by government entities" and "neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  For the same reason, the Court grants Plaintiff's request for judicial notice (ECF No. 39) with respect to exhibits A, B, D, and E.  The Court also takes judicial notice of Plaintiff's Exhibit C as the Complaint incorporates by reference the Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures.  (*See* Compl. ¶¶ 5, 45–46.)

"cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The Court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party."  *Steinle v. City and Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## DISCUSSION

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "Accordingly, if federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes restrictions that conflict with the federal law, the federal law takes precedence and the state law is preempted."  *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968 (9th Cir. 2026) (quotation omitted).

ExxonMobil proceeds on a theory of express preemption, meaning it alleges Congress "expressly preempt[ed] a state law by enacting a clear statement to that effect."  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1211 (9th Cir. 2020).  Specifically, Plaintiff asserts S.B. 261 is expressly preempted by the National Securities Markets Improvement Act ("NSMIA").  (Compl. ¶¶ 80–82.)

## I.  Scope of NSMIA's Preemption

NSMIA amended the Securities Act to address the problems posed by concurrent state and federal regulation of securities.  Prior to the Securities Act, states regulated the sale of securities through statutes known as "blue-sky" laws.  *Lindeen v. Sec. & Exch. Comm'n*, 825 F.3d 646, 649 (D.C. Cir. 2016).  These state regulatory

4

regimes often required registration and merits review of securities before they could be sold within the state. *Id.* However, after the 1929 stock market crash, Congress established federal oversight of the registration of securities through the 1933 Securities Act. *Id.* Pursuant to this Act, issuers had to comply with both federal and state registration requirements. While this provided federal oversight over securities, this system of dual federal and state regulation led to "redundant, costly, and ineffective" requirements. H.R. Rep. No. 104–864, at 39 (1996) (Conf. Rep.). To address this problem, Congress passed NSMIA, which amended the Securities Act to "preempt, on a widespread basis, state registration and qualification regimes," leaving "the federal government to oversee nation-wide securities offerings." *Lindeen*, 825 F.3d at 650. It is this preemption provision that ExxonMobil argues bars the enforcement of S.B. 261.

Where, as here, a "statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *In re Volkswagen*, 959 F.3d at 1211. NSMIA expressly preempts two categories of state laws relevant to this case: (1) those that require the "registration or qualification of securities" and (2) those that "directly or indirectly prohibit, limit, or impose any conditions upon the use of . . . any offering document" or "any proxy statement, report to shareholders, or other disclosure document relating to a covered security . . . that is required to be and is filed with the [Securities and Exchange] Commission." 15 U.S.C. §§ 77r(a)(1)–(2).

ExxonMobil argues S.B. 261 falls squarely within NSMIA's preemption provision as S.B. 261 "limits and imposes a condition on the use of a disclosure document," specifically the Form 10-K. (Opp'n at 9 (quotation omitted).) A Form 10-K is a report the Securities and Exchange Commission ("SEC") requires public companies to file each year. 17 C.F.R. § 249.310. Within a Form10-K, companies such as ExxonMobil disclose the "material factors that make an investment" in the company "risky." 17

C.F.R. § 229.105(a).  ExxonMobil thus includes on its report "a host of material business risks, including climate-related risks."  (Opp'n at 3; *see also* Compl. ¶ 82.) Because California's S.B. 261 requires ExxonMobil to disclose climate-related financial risks on its website, ExxonMobil argues it can no longer "rely on [its] federal Form 10-K to disclose [its] material business risks but must instead issue an *additional* standalone report addressing climate-related business risks."  (Opp'n at 1.)  Therefore, ExxonMobil claims S.B. 261 limits its "use" of the Form 10-K and is thus preempted. (*Id.* (quotation omitted).)

The term "use" in NSMIA's preemption provision is ambiguous and potentially sweeping.  Both parties propose different interpretations of what the term "use" means in this context.  ExxonMobil urges the Court to interpret "use" to encompass its use of the Form 10-K to inform investors of material business risks.  (Opp'n at 7.)  In other words, ExxonMobil's view of the term "use" is this: If an SEC filing serves a particular purpose federally and a state law seeks to fulfill the same purpose by requiring something additional to the SEC filing, that state law impermissibly limits that filing's "use."  (*See id.*)

In contrast, the State defines the purpose that must be served by this "use" for preemption to apply more narrowly.  While the State agrees with ExxonMobil that NSMIA preempts state laws requiring the revision or supplementation of SEC-filed documents, the State argues such preemption is limited to state statutes for which failure to comply affects the issuer's ability to offer securities within the state.  (Reply at 1.)  Therefore, in the State's view, what NSMIA does not preempt is state disclosure laws that do not affect an entity's ability to offer securities.

The State has the better argument.  The text of the statute supplies indicators of the outer bounds of the meaning of the word "use."  A "word is known by the company it keeps."  *Yates v. United States*, 574 U.S. 528, 543 (2015).  This principle helps courts "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of

6

Congress." *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).  The heading of section 77r identifies the section as providing "Exemption from State regulation of securities offerings."  15 U.S.C. § 77r.  "Although section headings cannot limit the plain meaning of a statutory text, 'they supply cues' as to what Congress intended."  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (quoting *Yates*, 574 U.S. at 540) (citation omitted).  And the cue Congress supplied here is clear: this section preempts designated state laws insofar as they regulate *securities offerings*.  That is, those state statutes that regulate the terms under which securities can be validly offered within the state.

Read in this context, 15 U.S.C. § 77r(a)(2)(B) preempts state laws that limit or impose conditions on the "use" of federal disclosure documents in state regulations of securities offerings.  In other words, it preempts state statutes that require issuers to either revise or supplement their federal filings to comply with ongoing state offering requirements.  In the context of a Form 10-K, section 77r(a)(2)(B) would preempt, for example, state laws that require issuers to either include in or supplement their Form 10-Ks with additional disclosures not required by federal regulations as a condition of offering securities within the state.  However, section 77r(a)(2)(B) would not preempt state statutes that require additional disclosures but do not in any way condition companies' ability to offer securities to investors in the state on compliance.

ExxonMobil objects to this interpretation primarily for two reasons.  First, it asserts that, under this interpretation, 77r(a)(2)(B) would "serve no purpose."  (Sur-Reply at 3.)  Because section 77r(a)(1) eliminates state-level securities registration, ExxonMobil reasons that Congress would not have made section 77r(a)(2)(B)'s "sole function" to "protect the use of SEC-filed disclosure documents in processes that the immediately preceding provision eliminates."  (*Id.*)  This argument misunderstands the State's interpretation of the statute.  The State does not assert that section 77r(a)(2)(B) simply prevents states from requiring issuers to revise their federal filings to register a security in the state, thus rendering it redundant to section 77r(a)(1).  Indeed, the State

7

acknowledges that, through subsection (a)(1), "NSMIA largely preempted these registration requirements." (Reply at 6.) However, in many states, issuers still must comply with other state filing requirements to <u>offer</u> securities within the state. *See, e.g.*, D.C. Code § 31-5603.08(b) (providing that covered federal securities may be offered in D.C. only after the payment of a filing fee and the filing of both a "consent to service of process" and "a copy of the registration statement filed by the issuer with the Securities and Exchange Commission under the Securities Act of 1933"); Mont. Code § 30-10-211(a) (requiring issuers of section 77r(b)-covered securities to file documents submitted to the SEC as well as "annual or periodic reports of the value of the federal covered securities offered or sold in this state"). Section 77r(a)(2)(B) thus ensures, not that state <u>registration</u> requirements can be met through unaltered federal filings, but rather that state <u>offering</u> requirements can.

Specifically, section 77r explicitly preserves state authority to "requir[e] the filing of any document filed with the [Securities and Exchange] Commission." 15 U.S.C. § 77r(c)(2)(A). States can therefore still require issuers to file an SEC-filing with the state as a condition of offering securities within the state. *See, e.g.*, Del. Code tit. 6, § 73-208(a) (permitting director to require the filing of certain documents with respect to a section 77r(b)-covered security, including "[p]rior to the initial offer" of such a security, "all documents that are part of a federal registration statement filed with the Securities and Exchange Commission" and "[a]fter the initial offer," of such a security, "all documents that are part of an amendment" to that statement); Wash. Code § 21.20.327(1) (same). But because of section 77r(a)(2)(B), a state could not condition an issuer's ability to offer a security in the state on the issuer submitting a federal filing to the state that includes disclosures not otherwise required by federal law. In enacting section 77r(a)(2)(B) Congress thus sought to ensure that issuers can "use" documents filed with the SEC to satisfy ongoing state-level securities filing requirements without states imposing additional conditions on these filings.

////

8

Second, ExxonMobil asserts this interpretation is implausible as "states obviously lack authority to meddle with federal reporting obligations." (Opp'n at 11.) But a state could conceivably craft a statute requiring issuers to include certain information in their Form 10-Ks in order to sell securities to in-state investors. Further, although the parties dispute whether states have the authority to enact such a statute, this dispute is ultimately irrelevant. The State agrees that section 77r(a)(2)(B)'s preemption extends not only to state laws that require alterations to federal filings but also to state laws that would require supplementation of federal filings with additional disclosures. (*See* Reply at 2.) Whether those state laws requiring supplementation must be tied to the offering of securities within the state to be preempted is where the parties' interpretations diverge

Moreover, ExxonMobil's proposed limitation on the meaning of "use" in section 77r(a)(2)(B) itself lacks textual support. Despite ExxonMobil's contentions to the contrary, it does not argue the Court should give this provision its pure, "plain" meaning. (*See* Opp'n at 10, 12.) ExxonMobil does not argue section 77r(a)(2)(B) preempts any state statute that "limits" any "use" of a federal disclosure document. Perhaps understanding that such a broad understanding of "use" is untenable (can a State prohibit use of a printed Form 10-K as fodder to start a campfire?), ExxonMobil instead seeks to cabin that word's meaning. ExxonMobil proposes that, if an SEC filing serves a purpose, such as the disclosure of material business risks, and a state law aims to fulfill that same purpose by requiring something other than the unaltered SEC filing, that state law impermissibly limits that filing's "use." But ExxonMobil does not tie this interpretation of the term "use" to any statutory text. ExxonMobil thus does not identify, and the Court cannot find, textual support for the limitation ExxonMobil proposes.

ExxonMobil's proffered interpretation could also render large swaths of state code across the country invalid. In California alone, at least two state laws require publicly traded entities doing business in the state to disclose various financial and

corporate governance information.  *See* Cal. Corp. Code §§ 2117, 2117.1.  Much of this information clearly overlaps with that included in a Form 10-K, not to mention other disclosure documents.  *Compare, e.g.*, Corp. Code § 2117.1(a)(4) (mandating disclosure of executive pay in form filed with Secretary of State) *with* 17 C.F.R. § 229.402 (requiring disclosure of executive pay in a Form 10-K).  Under Exxon's theory, these requirements would likely be preempted.

This potential for preemption extends to state laws outside the sphere of corporate regulation as well.  Covered entities must disclose executive compensation in their Form 10-Ks.  17 C.F.R. § 229.402.  But the California Labor Code requires employers with fifteen or more employees to disclose to the public the pay scale for a position in any job posting.  Cal. Lab. Code § 432.3(5).  The Form 10-K's required disclosure of a covered entity's financial risk would also call into question the validity of Cal. Bus. & Prof. Code § 22757.12, which requires the developer of a frontier artificial intelligence model to publish on its website whether the model's capabilities pose a material risk to more than $1,000,000,000 from a single incident.  *See* 17 C.F.R. § 229.105(a).  Covered entities must disclose in their Form 10-Ks how they identify, assess, and manage cybersecurity threats and identify if and how previous cybersecurity threats have affected the entity.  17 C.F.R. § 229.106(b)(2).  Entities conducting business in California must disclose specified cybersecurity breaches to affected individuals.  Cal. Civ. Code § 1798.82.  To name just a few.

The Court declines to adopt an interpretation of section 77r(a)(2)(B) that would vastly limit States' ability to require such disclosures absent clear direction from Congress.  Although section 77r(a)(1) upended many state laws requiring in-state securities registration, *see Lindeen*, 825 F.3d at 649–50, it did so clearly and explicitly.  Here, Congress did not explicitly preempt state laws that require any disclosures similar to or serving the same purpose as those that may appear in any federal securities filing.  Congress "does not, one might say, hide elephants in mouseholes,"

*////*

10

and the Court finds no elephants here.  *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (quoting *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

Finally, the Court's interpretation also aligns with both NSMIA's legislative history and Congress' stated purpose in enacting it.  "If a statute's terms are ambiguous, we may use legislative history and the statute's overall purpose to illuminate Congress's intent."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) (quotation omitted).  NSMIA's legislative history reveals Congress' intent in enacting this subsection of the preemption provision.  The House Committee Report explicitly links the text used in section 77r(a)(2)(B) to state regulation of securities offerings.  It provides that section 77r "preempts State regulation of other disclosure documents such as proxy statements and annual reports" through both "direct and indirect State action."  H.R. Rep. No. 104-622, at 30 (1996).  Two sentences later, the report states that, "[b]y extending the prohibition to indirect State action, the Committee specifically intends to prevent State regulators from circumventing the provisions of section 18(a) that expressly prohibit them from requiring the registration of, or otherwise imposing conditions or limitations upon, *offerings* of covered securities."  *Id.* (emphasis added).  Congress thus intended section 77r(a)(2)(B) to serve as reinforcement for section 77r(a)(1), preventing state legislatures from getting around its elimination of state registration systems, not as an additional substantive limit on state laws outside the context of securities offerings.

## II.  Application to S.B. 261

Under this interpretation of the text, section 77r(a)(2)(B) does not preempt enforcement of S.B. 261 against Exxon.  It is undisputed that S.B. 261 does not require covered entities to alter their federal filings with the SEC.  S.B. 261 also does not require covered entities to alter such federal filings for submission to the state.  And S.B. 261 does not compel covered entities to supplement their federal filings with additional disclosures to comply with state offering requirements.

////

11

S.B. 261's enforcement mechanism also does not relate to the offering of securities.  Entities that fail to meet S.B. 261's disclosure requirements face no consequences in their ability to offer securities to investors within the state.  Nor does a failure to disclose pursuant to S.B. 261 constitute noncompliance with any state securities notice requirement.  Such failures solely result in administrative penalties not exceeding $50,000.  Health & Safety Code § 38533(f)(2).  Therefore, section 77r(a)(2)(B) does not preempt enforcement of S.B. 261 against ExxonMobil.

**III. Leave to Amend**

Requests for leave to amend should be granted with "extreme liberality." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (quoting *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009)).  When deciding whether to grant leave to amend, a district court should consider undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies through prior amendments, undue prejudice to the opposing party, and futility.  *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  However, the "general rule that parties are allowed to amend their pleadings does not extend to cases in which any amendment would be an exercise in futility or where the amended complaint would also be subject to dismissal."  *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quotation omitted).  "Futility alone can justify a court's refusal to grant leave to amend."  *Id.*

With these factors in mind, the Court finds amendment would be futile as the statutory interpretation question this motion turns on is purely a question of law.  Accordingly, Plaintiff's Supremacy Clause claim is dismissed without leave to amend.

////

////

////

////

////

////

12

**CONCLUSION**

For the reasons stated above, the Court GRANTS Defendants' Motion to Dismiss (ECF No. 28).  Plaintiff's third claim for relief (ECF No. 1 ¶¶ 80–82) is dismissed without leave to amend.

IT IS SO ORDERED.

Dated:   **August 10, 2026**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC7 – Exxon25cv03104.mtd

13